UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PEG A. HICKS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | CASE NO. 1:06-cv-1651-DFH-TAB |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Peg A. Hicks seeks judicial review of a decision by the
Commissioner of the Social Security Administration denying her application for
disability insurance.  After a hearing, an Administrative Law Judge ("ALJ")
determined that Ms. Hicks suffered severe impairments, but that at the time her
insured status expired, she still retained the residual functional capacity to
perform simple and repetitive light exertional work.  Under the stringent standard
for disability under the Social Security Act, the ALJ concluded that she was not
entitled to benefits.  On appeal, Ms. Hicks contends that the ALJ erred (1) in
determining that her impairments in combination did not equal a listed
impairment; (2) in rejecting evidence of her complex regional pain syndrome
because the diagnosis did not occur during the insured period; (3) in evaluating
her mental impairments; (4) in ignoring evidence contrary to the result; (5) in
discounting her subjective assertions of pain; and (6) in failing to support his

decision with substantial evidence.  As explained below, the ALJ's decision is affirmed because it is supported by substantial evidence.

*Background*

Born in 1952, Ms. Hicks completed some college education and worked a variety of jobs including being a sales representative for a broadcasting company, running an animal shelter, and grooming dogs.  In 1984, Ms. Hicks was doing push-ups when she felt a pain in her chest, which she described as like Velcro being torn from her sternum.  R. 185.  The pain lasted for two months and then subsided.  In 1997, Ms. Hicks was involved in a car accident.  The seatbelt she was wearing, while keeping her safely in place, pushed against her sternum, again causing the same tearing pain.  This pain lasted another two months before subsiding.

On May 27, 2000, Ms. Hicks bent over and experienced what she thought was a heart attack.  She went to the hospital, where doctors noted that she complained of chest pain but displayed no signs of coronary artery disease.  R. 117, 125.  Dr. Janet Meckley suspected that Ms. Hicks might suffer from fibromyalgia.  R. 123.  Dr. Meckley also suspected that Ms. Hicks' pain was due to inflammation caused by her dog grooming work and recommended that Ms. Hicks "back off on grooming the dogs."  R. 125.

In December 2000, Ms. Hicks began seeing Dr. James Royer for her back pain.  R. 152.  Dr. Royer diagnosed osteoarthritis, insomnia, anxiety, and depression.  Ms. Hicks reported to Dr. Royer that her pain required her to stop working by late morning and to rest three to four hours before working for another few hours.  *Id.*  Dr. Royer prescribed several different anxiety and pain medications, but the only behavioral or activity change he recommended at that time was to stop smoking.  *Id.*

Based on her prior work history, Ms. Hicks' disability insured status expired December 31, 2000.  R. 56-57.  After that time, Ms. Hicks' physical conditions seemed to worsen.  Dr. Cory Gray found that Ms. Hicks had low bone mass in February 2001.  R. 114.  Dr. Beth Ingram observed evidence of disc dessication and bulges in Ms. Hicks' back in July 2001.  R. 110.  In August 2001, Dr. Vishwajit Brahmbhatt diagnosed Ms. Hicks with chronic back pain syndrome. R. 105.  These doctors prescribed a variety of pain medication to alleviate her pain.  R. 61-64.

Ms. Hicks continued to see Dr. Royer, her family physician, who noted in February 2003 that she experienced significant pain doing her dog grooming work. R. 157.  At some point in 2003, Dr. William Rheuble diagnosed Ms. Hicks' constant pain as reflex sympathetic dystrophy, or complex regional pain syndrome.  R. 185, 249.  In August 2003, Dr. Royer agreed with this diagnosis, adding that Ms. Hicks had been experiencing chest and back pain for a number

of years.  R. 185.  Ms. Hicks began undergoing treatment for complex regional pain syndrome with Dr. Bruce Massau in 2004.  R. 236.

In December 2004, Dr. Massau opined that Ms. Hicks was unemployable due to impairments expected to last at least twelve months.  R. 190-92.  He noted that Ms. Hicks had significant limitation of motion and multiple joint pain that constantly interfered with her attention and concentration.  Ms. Hicks could continuously sit for no longer than ninety minutes and could continuously stand for no longer than ten minutes.  Ms. Hicks could stand for up to two hours per eight hour workday and could sit for up to six hours per eight hour workday.  She could rarely lift objects less than ten pounds, rarely twist or stoop, and never lift objects heavier than ten pounds.

In December 2004, Dr. Jane Palmer Smith also treated Ms. Hicks for complex regional pain syndrome and fibromyalgia.  R. 193-98.  Dr. Smith noted that Ms. Hicks' pain was severe and that her medications caused memory loss and fragmented thought patterns.  Due to her condition, Ms. Hicks would have to take between eight and ten unscheduled breaks per day, resting between one and three hours before returning to work after each break.  Dr. Smith noted that Ms. Hicks could sit continuously for no longer than twenty minutes and could not stand continuously for any length of time.  She could occasionally lift objects up to ten pounds, occasionally twist or stoop, rarely lift objects weighing twenty pounds,

and never lift objects weighing fifty pounds.  Dr. Smith also noted that her conditions would cause her to miss work more than four days a month.

Ms. Hicks filed a claim for disability insurance in the spring of 2003 and had an administrative hearing in January 2005.  At the hearing, a vocational expert testified that based on her own descriptions of her physical limitations, Ms. Hicks could not perform any work.  R. 266-67.  The vocational expert then testified that individuals restricted to simple and repetitive light exertional work based on musculoskeletal back, chest, and joint pain and headaches, anxiety, and depression could work as information clerks, stock clerks, order fillers, and record clerks.  R. 267-69.  Individuals with the same limitations but restricted to sedentary work could serve as receptionists, credit authorizers, checkers, and general office clerks.  R. 269-70.  The ALJ denied Ms. Hicks' disability claim in September 2005, finding that before December 31, 2000, Ms. Hicks had the residual functional capacity to perform simple and repetitive light exertional work.

*Statutory Framework for Determining Disability*

To be eligible for disability insurance benefits, Ms. Hicks must establish that she suffers from a disability as defined by the Social Security Act ("Act") in 42 U.S.C. § 423(d).  Under § 423(d), a disability is an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or

can be expected to last for a continuous period of no less than twelve months. The disability must arise while the claimant is insured for benefits, so in this case, Ms. Hicks must demonstrate that she met the standard no later than December 31, 2000.  See 42 U.S.C. §§ 423(a), (c)(1); *Briscoe v. Barnhart*, 425 F.3d 345, 348 (7th Cir. 2005); 20 C.F.R. § 404.131.

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  The Act provides important assistance for some of the most disadvantaged members of American society.  But before tax dollars are available for disability benefits, it must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work.  Under the statutory standard, these benefits are available as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step sequential evaluation of a disability claim.  See 20 C.F.R. § 404.1520(a)(4).  The steps are:

    (1)    Is the claimant currently employed?  If so, she is not disabled.

    (2)    If not, does the claimant have a severe impairment or combination of impairments?  If not, she is not disabled.

    (3)    If so, does the impairment meet or equal an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. § 404?  If so, the claimant is disabled.

(4)     If not, does the claimant retain the residual functional capacity to perform her past relevant work?  If so, she is not disabled.

(5)     If not, according to the claimant's residual functional capacity, age, education, and work experience, can the claimant make an adjustment to other work?  If so, she is not disabled.  If not, she is disabled.

When applying this test, the burden of proof rests on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).


*Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  The ALJ has a basic obligation to develop a full and fair record, *Nelson*, 131 F.3d at 1235, and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings, *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003).  If the evidence on which the ALJ relied does not support the conclusion, the decision cannot be upheld.  *Id.*

*The ALJ's Disability Determination*

Applying the five-step process, the ALJ reserved his determination in the first step.  The ALJ observed that no evidence existed to show that Ms. Hicks was presently employed, but in the event of a remand, the ALJ wanted further information about the history of her dog grooming work.  At the second step, the ALJ determined that Ms. Hicks' degenerative disc disease, spondylolisthesis, degenerative joint disease, and depression constituted severe impairments.  The ALJ also found that Ms. Hicks had a non-severe cardiac impairment.

At the third step, the ALJ found that these impairments did not meet or equal a listed impairment.  At the fourth step, the ALJ found that Ms. Hicks could not continue to perform her past relevant work of dog grooming based on her

then-current residual functional capacity.  At the fifth step, the ALJ found that Ms. Hicks was limited to simple and repetitive light exertional work.  Based on the vocational expert's testimony, the ALJ found that Ms. Hicks could perform the work of an information clerk, stock clerk, order filler, or record clerk.  The ALJ therefore concluded that Ms. Hicks was not disabled for purposes of the Social Security Act before December 31, 2000.  The Appeals Council denied Ms. Hicks' request for review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Ms. Hicks asks this court to review the denial of her application.  The court has jurisdiction under 42 U.S.C. § 405(g).

## Discussion

I.   *Listed Impairment*

Ms. Hicks first claims that the ALJ violated her right to due process by failing to determine whether the combination of her impairments equaled a listed impairment.  The ALJ determined that before Ms. Hicks' insured status expired, she had several severe impairments – degenerative disc disease, spondylolisthesis, degenerative joint disease, and depression – and a non-severe cardiac impairment.  R. 18, 23-24.  As part of his rationale section, the ALJ evaluated each severe impairment individually and determined that none equaled a listing.  R. 18-19.  He did not, however, explain his reasoning for later determining that no combination of impairments – severe and non-severe – equaled a listing.  R. 24.

Ideally, an ALJ would discuss his specific rationale for finding that a combination of impairments which he found did not individually equal a listing also did not equal a listing in the aggregate. See *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) (reminding ALJs at step five not to "narrowly confine their review to isolated impairments when the record shows that the impairments have some 'combined effect'"); 20 C.F.R. § 416.926(b)(3) (providing that combinations of impairments which individually do not meet a listing should be compared to "closely analogous listed impairments"). This procedural defect does not require remand, however, if the ALJ's vocational analysis persuades reviewing courts that the ALJ considered the impairments' combined effects on the claimant's ability to perform particular kinds of work. See *Sims*, 309 F.3d at 432; see generally *Sullivan v. Zebley*, 493 U.S. 521, 529-35 (1990) (observing that the listings are not designed to cover all disabling medical conditions and that for adults, "these shortcomings of the listings are remedied at the final, vocational steps of the Secretary's test").

Here, the ALJ's vocational analysis demonstrates that he considered the aggregated effects of Ms. Hicks' impairments in determining that she was not disabled as of December 31, 2000. The ALJ asked the vocational expert if jobs existed for individuals with a combination of limitations from musculoskeletal pain in the back, chest, and hands and limitations from headaches, depression, and anxiety. R. 267. The vocational expert found that such individuals could work as information clerks, stock clerks, order fillers, and record clerks. R. 268-

69.  The vocational expert then testified that if such persons were restricted to unskilled sedentary work, they could work as receptionists, credit authorizers, checkers, and general office clerks.  R. 269-70.

The ALJ also demonstrated his consideration of the aggregated effects of Ms. Hicks' impairments in finding that Ms. Hicks could have performed simple and repetitive light work not involving unusual stress or more than occasional bending before December 31, 2000.  The ALJ considered Ms. Hicks' physical limitations in determining that she could not perform work more strenuous than light work. He then added two other restrictions tailored to Ms. Hicks' impairments:  unusual stress and frequent bending.  The ALJ eliminated positions with unusual stress from his consideration due to Ms. Hicks' depression and feelings of anxiety.  R. 20. The ALJ eliminated positions requiring frequent bending because Ms. Hicks reported that bending increased her back pain.  R. 20-21.

Ms. Hicks bears the burden of proving that her condition met or equaled a listing, and she has been represented by counsel throughout the administrative proceedings.  Even on judicial review, she has not pointed to any particular listing that she contends a combination of her impairments would have met or equaled, nor has she come forward with evidence that the combination met or equaled any particular listing.  Because the ALJ considered the aggregated effects of Ms. Hicks' impairments in his vocational analysis and because Ms. Hicks has not shown how

she might have equaled any particular listing, the court finds no error requiring remand at step three.

II.   *Complex Regional Pain Syndrome*

Ms. Hicks claims that she became unable to work no later than May 28, 2000.   R. 59.   Based on her past work and earnings history, Ms. Hicks was insured for disability insurance benefits through December 31, 2000.   The ALJ found that at that time, Ms. Hicks had several severe impairments – degenerative disc disease, spondylolisthesis, degenerative joint disease, and depression.   He determined, however, that these impairments did not prevent her from performing simple and repetitive light exertional work.

Ms. Hicks contends that the ALJ improperly rejected evidence of symptoms relating to her complex regional pain syndrome because he found that the condition did not prevent her from performing light work before December 31, 2000.   She points to a May 27, 2000, report by Dr. Janet Meckley, who treated her for chest pain during an emergency room visit.   Dr. Meckley reported that Ms. Hicks had multiple joint and shoulder pains and that Dr. Meckley suspected fibromyalgia.  R. 123.   The only other cited documentation from before her insured status expired is a record of her first visit to Dr. Royer, who later became her treating physician.   On December 18, 2000, Dr. Royer noted that Ms. Hicks had chronic lower back pain and some deformities in her hand joints, which he

diagnosed as osteoarthritis.  R. 152.  He noted that Ms. Hicks reported that her pain usually began in the morning and that she had to rest three to four hours per day.  He did not identify or discuss any objective findings of physical or mental limitations.

At some point in 2003, Dr. William Rheuble diagnosed Ms. Hicks as having complex regional pain syndrome, a chronic pain condition.  R. 185.  Dr. Royer agreed with this diagnosis.  During a check-up on August 21, 2003, Dr. Royer noted that Ms. Hicks had complained of severe regional pain for many years.  *Id.* In a general letter dated November 13, 2003, Dr. Royer wrote that Ms. Hicks "has had pain related to [complex regional pain syndrome] going back at least to May 2000."  R. 184.  Dr. Royer further noted that since that time, Ms. Hicks' pain had "gradually increased in severity" to the point where, in his opinion, she could not lift, push, or pull items weighing as little as three pounds without having "intractable pain."  *Id.*  He did not make any more specific assertions about physical limitations before December 31, 2000.

The Seventh Circuit has recognized that a retrospective diagnosis made after the claimant's insured status expires may support a finding of disability, but a "retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period."  *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998).  In *Estok*, the claimant filed for disability benefits twice based on foot pain, the last time being sometime in early 1993.  The ALJ determined that the

claimant was insured for disability benefits only through December 31, 1992. In the mid-1980s, the claimant was treated for tarsal tunnel syndrome. The foot pain later radiated throughout her entire body and in late 1993, the claimant received a diagnosis of fibromyalgia. Several doctors later opined that the claimant had suffered from fibromyalgia before her insured status expired in December 1992.

The ALJ denied Estok's claim for benefits, finding that fibromyalgia had not disabled her by the time her insured status expired in December 1992. The Seventh Circuit affirmed the denial because the retrospective diagnoses said nothing about when, if ever, the claimant's fibromyalgia became so severe that it prohibited her from performing any work. *Id.* at 639-40. The rest of the record indicated that the claimant had suffered foot pain before her insured status expired rather than the diffuse pain the claimant later experienced. No contemporaneous evidence substantiated the intensity or persistence of the pain the claimant asserted was disabling.

Similarly here, the parties do not dispute that Ms. Hicks currently suffers from intense pain that doctors identified in 2003 as complex regional pain syndrome. The problem is that there is no contemporaneous evidence that demonstrates that the pain Ms. Hicks experienced as of December 31, 2000, was disabling. Dr. Meckley and Dr. Royer noted in 2000 that Ms. Hicks suffered from joint, shoulder, and lower back pain. Dr. Meckley tentatively labeled Ms. Hicks'

condition as fibromyalgia.  Dr. Royer reported that Ms. Hicks suffered from osteoarthritis.  Like the doctors in *Estok*, neither Dr. Meckley nor Dr. Royer described any physical limitations that would have prevented Ms. Hicks from performing all forms of work *at that time.*  At most, Dr. Meckley noted that it seemed that most of Ms. Hicks' pain came from her dog grooming work and she recommended that Ms. Hicks "back off on grooming the dogs."  R. 125.

Ms. Hicks' own descriptions of her pain do not appear in the record until 2003, when she filed for disability insurance and around the time that Dr. Rheuble diagnosed complex regional pain syndrome.  R. 42, 58-70, 84-85, 87-91, 94-95.  At her administrative hearing in January 2005, Ms. Hicks asserted that as of December 2000, it would have been difficult for her to lift objects weighing up to five pounds, to walk for more than twenty or twenty-five minutes at a slow pace while using her cane, to stand unassisted for any amount of time, or to sit for more than thirty minutes.  R. 256-57.  Even while describing these limitations, Ms. Hicks seemed confused about whether these limitations existed in December 2000 or whether she was describing her limitations as of January 2005.  *Id.*  Due to the lack of any contemporaneous evidence demonstrating that Ms. Hicks was incapable of performing even light or sedentary work as of December 2000, the ALJ did not improperly reject Ms. Hicks' later symptoms and diagnoses of complex regional pain syndrome in denying her claim for disability.

III.    *Mental Impairments*

-15-

Ms. Hicks next asserts that the ALJ erred in not obtaining a psychological evaluation and in not summoning a psychologist to testify about her mental impairments.  Dr. Reid Klion, Ph.D., filled out a Psychiatric Review Technique form on April 12, 2003, indicating that he had insufficient evidence to evaluate Ms. Hicks' mental impairments and that she had co-existing non-mental impairments that should be evaluated by another specialist.  R. 170.  The ALJ did not seek out any other medical evidence regarding Ms. Hicks' mental impairments or request any other psychiatric reviews or mental residual functional capacity assessments.  No medical experts were present to testify at Ms. Hicks' hearing on January 20, 2005.  R. 233.

When she applied for disability insurance in February 2003, Ms. Hicks reported two impairments that limited her ability to work:  degenerative disc disease and thoracic injuries.  R. 59.  Ms. Hicks did not discuss any mental impairments in her application except to mention that Dr. Meckley treated her sometime in 1999 and 2000 for anxiety.  R. 61.  When requesting a hearing, Ms. Hicks reported that the side effects from her pain medication made her "the village idiot," but again, she did not argue that a particular mental impairment was a basis for her disability claim.   R. 94.

The medical records gathered to substantiate her physical impairments also discussed Ms. Hicks' depression, insomnia, anxiety, and anorexia.  R. 105, 122,

124, 152-58.  Ms. Hicks did not complain that these conditions limited her ability to work or even constituted her chief complaints.  To the contrary, on April 30, 2001, Ms. Hicks reported to Dr. Royer during a routine check-up that she felt a "little depressed" but that she could "deal with that."  R. 153.  On July 18, 2001, Ms. Hicks again reported to Dr. Royer during a routine check-up that she was able to control her anxiety and depression with medication.  *Id.*  The records also indicate that Ms. Hicks' experiences with anorexia occurred decades before she stopped working.  R. 124, 152.

While the ALJ did not seek out further detailed medical assessments of Ms. Hicks' mental impairments, he did find that her mental impairments were severe and moderately limited her ability to engage in routine activities.  R. 19.  He then found that she was able to control her insomnia, depression, and anxiety effectively with medication.  R. 21.  Nonetheless, in assessing Ms. Hicks' residual functional capacity in conjunction with her mental conditions, the ALJ limited Ms. Hicks' vocational abilities to simple and repetitive work that was not unusually stressful.  Because Ms. Hicks did not assert that her mental impairments were disabling (and in fact, the record demonstrates that Ms. Hicks was able to control those impairments with medication), and because the ALJ nevertheless adjusted her residual functional capacity to accommodate her mental impairments, the ALJ's failure to seek out further evidence or testimony relating to Ms. Hicks' mental impairments does not require a remand.  See generally *Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the

burden of supplying adequate records and evidence to prove [the] claim of disability."); *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits.").

IV.   *Treatment of Conflicting Evidence*

Ms. Hicks next asserts that the ALJ ignored evidence contrary to his denial of benefits.  She claims that the ALJ ignored Dr. Meckley's assessment and treatment records from her May 2000 visit to the emergency room for chest pain. The ALJ discussed Dr. Meckley's assessment in his decision:

> The file makes a reference to costochondritis in May of 2000 (Ex. 1F at 25-26).  This condition, though not definitively diagnosed in the record, can mimic cardiac pain.  I note, however, that x-rays of her chest and sternum showed no evidence of arthritis in the costochondral junctions in the anterior chest (Ex. A at 1).

R. 18.  Contrary to Ms. Hicks' assertion, the ALJ noted and discussed evidence of her chest pain.  The ALJ also noted that Dr. Meckley wrote a letter in March 2003 stating that she had not seen Ms. Hicks since November 2000 and had no "input as far as her functional limitations for physical activity, etc.  I know she had been getting a lot of tendinitis type symptoms when she was grooming dogs the last time I saw her two years ago, but I have no input since that point."  R. 22, 168.

Ms. Hicks also claims that the ALJ ignored evidence of her history of peptic ulcer disease.  The ALJ did not discuss any history of peptic ulcer disease.  The only mention of peptic ulcer disease in the record is found in Ms. Hicks' May 2000 emergency room discharge diagnosis record.  R. 125.  Aside from mentioning it once in her brief on appeal to this court, Pl. Br. at 31, Ms. Hicks never discussed a history of peptic ulcer disease or asserted that the condition contributed to her inability to work.  In fact, Dr. Eileen Cravens noted in a June 13, 2000 endoscopy report that Ms. Hicks had no "frank ulcer[s] or erosions" in her esophagus and no ulcers or erosions in her stomach or duodenum.  R. 116.  Thus, the ALJ's failure to discuss the condition in his decision does not warrant a remand.  See *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) (observing that an ALJ must consider and discuss the "important" evidence, but that the ALJ is not required to provide a "written evaluation of every piece of testimony and submitted evidence").

V.    *Credibility*

Ms. Hicks next asserts that the ALJ  improperly evaluated her testimony, particularly regarding her severe chest pain, violating Social Security Ruling 96-7p (July 2, 1996).  Social Security Ruling 96-7p requires ALJs to consider the "location, duration, frequency, and intensity" of the claimant's symptoms when evaluating the claimant's credibility.  Here, the ALJ evaluated Ms. Hicks' subjective complaints of pain, but observed that "there is very little contemporaneous evidence during the relevant period at issue . . . ."  R. 20.  He

went on to consider evidence from 2000 to early 2002 to determine that before December 31, 2000, Ms. Hicks had "some physical and mental symptoms," but the frequency, duration, and intensity of those symptoms did not prevent her from performing "a wide range of light work."  R. 21.

As discussed above and as the ALJ noted, the record contains very little contemporaneous objective or subjective evidence of Ms. Hicks' conditions at the relevant time.  Her subjective complaints reporting extensive physical limitations began to appear in the record in early 2003, several years after her disability insured status expired.  See R. 58-70, 84-85, 87-95.  Contemporaneous objective evidence demonstrates that Dr. Meckley advised Ms. Hicks to stop grooming dogs, but no doctor discussed or recommended any other physical limitations.  Because of the lack of contemporaneous evidence, either objective or subjective, supporting Ms. Hicks' claim that she was disabled before December 31, 2000, the ALJ's decision to discount Ms. Hicks' later assertions and doctors' later findings of extensive physical limitations was not erroneous.

VI.    *Substantial Evidence*

Finally, Ms. Hicks asserts, without citations to the record, that the ALJ did not support his ruling with substantial evidence because he did not require additional rest breaks in his residual functional capacity assessment.  She also argues, again without citing the record, that the ALJ improperly rejected evidence of treating physicians that proved she was disabled.  It is true that several doctors

in 2003 and 2004 found that because of her physical impairments, Ms. Hicks had severe physical limitations on her ability to work.  As discussed above, however, there is no evidence generated before or relating to the period before December 31, 2000, that indicates that Ms. Hicks' impairments had progressed to the point that she was unable to perform any work at that time.  Accordingly, the ALJ built an accurate and logical bridge between the evidence presented and the denial of benefits.  See *Blakes*, 331 F.3d at 569.

*Conclusion*

For the foregoing reasons, the court affirms the ALJ's decision.  Final judgment shall be entered consistent with this entry.

So ordered.

Date: January 8, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov,lin.montigney@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net